**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

| | |
|---|---|
| IN RE:<br><br>INDUSTRIAL HUMAN CAPITAL, INC.,<br><br>    Debtor. | Chapter 7 Case<br><br>Case No. 23-11014-LMI |
| BULLDOG INVESTORS, LLP,<br><br>    Plaintiff,<br><br>    v.<br><br>ROBERT A. ANGUEIRA, solely in his capacity as Chapter 7 Trustee of the Bankruptcy Estate of INDUSTRIAL HUMAN CAPITAL, INC.,<br><br>    Defendant. | **COMPLAINT FOR DECLARATORY RELIEF AND TO DETERMINE PROPERTY OF THE ESTATE**<br><br>Adv. Pro. No.: |

Plaintiff Bulldog Investors, LLP ("Plaintiff"), by and through its undersigned counsel, brings this action against defendant, Robert A. Angueira, solely in his capacity as Chapter 7 trustee for the bankruptcy estate of Industrial Human Capital, Inc ("Defendant" or "Trustee"), for declaratory relief ruling that the Trustee has no valid claims to recover funds that were held in trust for public stockholders and never the property of this bankruptcy estate.

## I.    INTRODUCTION

1.    The debtor, Industrial Human Capital, Inc. ("Debtor"), is a special purpose acquisition company ("SPAC") that failed to achieve its only purpose, to find a private company to acquire and bring public. Now, under the Trustee's control, it has turned on its own stockholders.

2.    Public investors agreed to commit capital to the SPAC—over $115 million—on the understanding that the funds would be held pursuant to an Investment Management Trust

Agreement (the "Trust") for the benefit of common stockholders while the search was conducted. Continental Stock Transfer & Trust Company ("Continental") was appointed trustee.

3. If the Debtor succeeded in identifying a transaction, the public stockholders would have the option to hold shares in the post-transaction company or, in the alternative, redeem their shares for a *pro rata* portion of the funds held in trust. If the Debtor failed to identify a transaction, the funds in trust, by the very terms of the Trust, would be returned promptly to public stockholders. In either case, public stockholders had no control of the SPAC's operations, which were managed entirely by its Sponsor (defined below) and directors and officers selected by the Sponsor.

4. The Debtor ultimately failed to complete a transaction before its one-year deadline. In December 2022, it returned the funds held in trust to public stockholders.

5. Months later—after failing to resolve a dispute with the Sponsor over an aggregate of $1 million in unpaid service-provider bills—a group of creditors filed an involuntary petition for bankruptcy of the Debtor, which the Court granted. The Trustee then retained counsel to pursue the estate's claims for a 30-40% contingency fee of any money recovered.

6. A year later, in December 2023, the Trustee sued the Sponsor and members of management, and that case remains pending. Upon information and belief, aggregate claims against the Debtor are about $1.5 million.

7. In January 2023, however, the Trustee implemented a new and nonsensical strategy. Through its contingency law firm, the Trustee has sent letters and draft complaints to dozens of public stockholders, including Plaintiff, demanding that stockholders return the *entire amounts* distributed from the Trust (roughly $117 million) despite only $1.5 million in purported creditor claims. Through this patently abusive and inequitable process, the law firm stands to

realize as much as $46 million in contingency fees, potentially leaving stockholders with senseless losses caused solely by the Trustee's conduct and creditor claims they had nothing to do with.

8. In advance of imminent, costly and disruptive litigation, Plaintiff seeks a declaratory judgment holding that the Trustee's purported claims are invalid and unsupported as a matter of black letter law because the Trust was never part of the Debtor's estate or subject to claims under Chapter 5 of Title 11. Moreover, the transfer of the Trust Funds back to public stockholders was protected by law and equity from preference claims, including by § 546(e) and § 548(a)(1)(A).

9. Judgment in Plaintiff's favor is warranted to resolve this actual and substantial dispute.

## II. THE PARTIES

10. Plaintiff is an investment manager that manages certain investment accounts that invested in the Debtor's Class A common stock ("Public Shares"). Defendant has threatened to sue Plaintiff on claims arising under Chapter 5 of Title 11, U.S.C. to recover approximately $300,000 of the funds previously held in trust.

11. Defendant is the duly appointed and acting Trustee for the bankruptcy estate of the Debtor.

12. Prior to the involuntary bankruptcy petition filed against it, the Debtor was a Delaware corporation formed solely for the purpose of completing a business combination.

## III. JURISDICTION AND VENUE

13. This is an adversary proceeding brought pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure.

14. This case arises in the bankruptcy case of Industrial Human Capital, Inc, pending under Case No. 23-11014-LMI.

15. The Court has core subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (K) and (O), and 28 U.S.C. §1334(b).

16. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### IV. SUBSTANTIVE ALLEGATIONS

#### A. Background On SPACs

17. SPACs are organized for the purpose of finding a private company to acquire and take public (through a so-called "de-SPAC" transaction).

18. To accomplish its purpose, a SPAC's sponsor acts effectively as "general partner" responsible for conducting the SPAC's search for a transaction partner.

19. SPACs begin operations with an initial public offering, or "IPO" to raise capital from public investors for a potential business combination, which is immediately placed in an interest-bearing trust account while the search commences.

20. The IPO funds are held in trust until (a) the SPAC completes a business combination or (b) it liquidates after failing to consummate a transaction within the allowed time.

21. If the SPAC identifies a business combination to propose to stockholders, each public stockholder can choose to hold their shares in the post-transaction company or redeem their shares for a *pro rata* portion of the trust account.

22. If the SPAC fails to complete a transaction within the allowed time, the trust account is liquidated and promptly distributed *pro rata* to public stockholders.

23. Because substantially all of the proceeds from the IPO are held in trust while the SPAC searches for a business combination, public investors have an absolute right to receive them

if the SPAC fails to complete a business combination. Indeed, a fundamental premise of the SPAC model is that trust account assets are sacrosanct.[1]

### B. The Debtor Is Formed And Completes Its Public Offering

24. The Debtor is a SPAC formed solely for the purpose of effecting a business combination.

25. ShiftPixy Investments, Inc. (the "Sponsor"), a wholly owned subsidiary of ShiftPixy, Inc., exercised complete control over the Debtor and was responsible for identifying, negotiating, and completing a business combination. It also selected the SPAC's Board of Directors (the "Board") and provided its officers.

26. On October 22, 2021, the Debtor consummated an IPO of 11,500,000 units—each unit consisting of one share of Class A common stock and one warrant—at $10.00 per unit, as well as the sale of approximately 4.6 million warrants to the Sponsor in a private placement at $1.00 per warrant.

27. Substantially all of the net proceeds of the IPO and the warrant sale—approximately $116,725,000 or $10.15 per unit (the "Trust Funds")—were placed into a trust account managed by Continental for the benefit of the public stockholders (the "Trust Account").

---

[1] Klausner, Michael Ohlrogge, and Emily Ruan, "A Sober Look at SPACs," Yale Journal on Regulation 39, no. 1, 2022, at p. 237 ("[I]f the SPAC does not merge within the period provided for in the charter . . . the SPAC must liquidate and distribute the funds in the trust to its public shareholders."); Riemer, Daniel S., "Special Purpose Acquisition Companies: SPAC and SPAN, or Blank Check Redux?" Washington University Law Review 85, no. 4, 2007, at p. 960 ("[T]he worst-case scenario for SPAC investors is that they are refunded the portion of their initial investment that had been accruing interest in escrow."); Gahng, Minmo, Jay R. Ritter, and Donghang Zhang, "SPACs," The Review of Financial Studies 36, no. 9, 2023, at pp. 3464-3465 ("If a SPAC cannot consummate a merger within this timeline, it must liquidate, distributing the IPO proceeds and the accrued interest in the trust account to its public shareholders.").

28. The Trust Account was established pursuant to the Trust, a true copy of which is attached hereto as **Exhibit "A"**. Pursuant to the Trust, the Trust Funds were "delivered to [Continental] to be deposited and held in a segregated trust account . . . for the benefit of the Company and the holders of the Common Stock included in the Units issued in the [IPO]."

29. The Trust permitted Continental to disburse funds only in the *four* circumstances described below:

    a. In the event of a business combination, to fund the transaction and the associated stockholder redemption requests. § 1(i) and Trust Agmt. Ex. A.

    b. In the event that the Debtor failed to complete a business combination, to distribute the assets *pro rata* to common stockholders. § 1(j) and Trust Agmt. Ex. B. In such case, Continental was to "transfer the total proceeds into a segregated account [for] *distribution to the Public Stockholders*. Trust Agmt. Ex. B (emphasis added). Continental was to serve as the "Paying Agent of record" and agreed "to distribute said funds directly to the Company's Public Stockholders in accordance with the terms of the Trust Agreement and the Charter." *Id.*

    c. In the event that taxes were owed on the interest earned in the account, a portion of the accrued interest could be disbursed to pay taxes so long as the "principal amount per share" deposited by stockholders would not be reduced. § 1(j) and Trust Agmt. Ex. C.

    d. In the event that the Debtor sought an extension of the time to complete a business combination and stockholders exercised their right to redeem their shares in connection with the extension proposal, funds could be disbursed

to meet the redemption requests. § 1(k) and Trust Agmt. Ex. D. In such case, Continental was required to transfer funds to a "segregated account . . . for distribution to the [s]tockholders who have requested redemption of their [c]ommon [s]tock."

30. Continental expressly agreed to "[n]ot make any withdrawals or distributions from the Trust Account other than pursuant to Section 1(i), (j) or (k)," as outlined above. *See* Trust Agmt. § 1(l).

31. To provide working capital *outside of the Trust Account* necessary to search for a merger partner, the Sponsor agreed to provide the Debtor with a promissory note of up to $500,000, purchased 4.3 million "Founder Shares" for $25,000, and provided certain working capital loans, all of which were to be used to provide the Debtor with working capital. In addition, $800,000 from the initial private warrant sale was reserved outside of the Trust Account for use as working capital.

32. The Sponsor agreed to indemnify the Debtor for any excess expenses incurred by the Debtor during its search.

### C. The SPAC Fails To Complete A Business Combination And Winds Down

33. Throughout 2022, the Sponsor and Debtor searched for a business combination but were unable to find a willing merger partner.

34. In July 2022, with no deal in hand, the Debtor's Board of Directors (the "Board") began to discuss the possibility of obtaining an extension of the merger deadline, which they ultimately proposed to stockholders. Around this time, and unbeknownst to stockholders, certain creditors of the Debtor began to demand payment for outstanding bills that the Sponsor had failed to pay.

35. At a special stockholder meeting on October 14, 2022, stockholders voted on a proposal to extend the date by which the Debtor had to consummate a business combination from October 22, 2022 to April 22, 2023. In connection with the vote, stockholders were also provided the opportunity to redeem their shares for a *pro rata* share of the Trust Account rather than remain invested during the extended search.

36. Although stockholders approved the extension proposal, the vast majority (98.84%) exercised their right to redeem their shares in exchange for a *pro rata* share of the Trust Account, which left insufficient funds in the Trust Account for the Debtor to continue its search for a business combination.

37. As a result, on November 14, 2022, the Debtor disclosed that the extension proposal was cancelled. Further, because the Debtor had not completed a business combination by its 12-month deadline (October 22, 2021), it stated that it would proceed under its Articles of Incorporation to cease operations, dissolve, and liquidate.

38. On or around December 6, 2022, the Debtor redeemed all outstanding Public Shares and distributed *pro rata* to stockholders the Trust Funds, which had grown to approximately $117 million as a result of interest.

39. Pursuant to the Trust, Continental arranged for payment of the Trust Funds directly to public stockholders through The Depository Trust Company ("DTC"), which provides recordkeeping, clearing, and settlement services for the vast majority of securities transactions in the United States.

40. The Trust Funds were transferred to public stockholders through DTC and the various financial institutions and intermediaries through which stockholders held their shares, such as banks, brokers, financial advisers, and defined-contribution plans.

**D.      The Creditors, Prior Litigation, And The Involuntary Petition**

41. While searching for a business combination in 2022, the Sponsor caused the SPAC to incur service provider expenses in excess of its available cash. Public stockholders had no control over, or contemporaneous knowledge of, the Debtor's operations or expenses.

42. In mid-2022, various of Debtor's service providers (the "Creditors"), including Berkowitz Pollack Brant Advisors and Accountants, LLP ("Berkowitz), Effectus Group, LLC ("Effectus"), and Cargas Systems, Inc. ("Cargas"), began to make efforts to obtain payment for purportedly outstanding bills. Berkowitz, for its part, retained the law firm of Berger Singerman to send a demand letter to the Debtor and handle collections efforts.

43. Together, Berkowitz, Effectus and Cargas claim to be owed slightly more than $1 million. To date, total submitted claims in this proceeding total only $1.5 million.

44. On February 7, 2023—*i.e.,* months after the distribution of the Trust Funds, *which no Creditor challenged or sought to have enjoined*—Berkowitz, Effectus and Cargas, represented, in part, by Berger Singerman, filed an involuntary petition (the "Petition") against the Debtor under Chapter 7 of Title 11.

45. On March 3, 2023, the Court entered the Order for Relief (ECF 9). On March 6, 2023, Robert Angueira was appointed as Trustee (ECF 14).

**E.      The Trustee Hires Berger Singerman LLP On Contingency To Recover The *Entire Redemption Amount* From The Public Stockholders**

46. On March 10, 2023—only *four days* after his appointment as Trustee, the Trustee applied for approval to hire the law firm of Berger Singerman "as special litigation counsel to investigate and, if appropriate, pursue any and all claims or causes of action of the [e]state." (ECF 15) The Court approved the application on April 11, 2023. (ECF 30)

9

47. Berger Singerman's contingency arrangement provides that it will be entitled to between 30% and 40% of any gross recovery achieved, depending on the procedural stage of the case at the time of recovery.

48. On January 12, 2024, Berger Singerman sent a "Demand for Payment and to Preserve Documents" to Plaintiff (the "Demand") (filed herewith as **Exhibit "B"**), which demanded the return of the *entire amount received by Plaintiff and/or its clients in connection with the Debtor's redemption of its Public Shares*, despite that the Trust Funds had been held in trust for the sole benefit of holders of Public Shares since the IPO.

49. The Demand stated:

> Based on the Debtor's book and records and the Trustee's research to date, the amount of the Redemption Transfer that you received and owe to the Debtor's bankruptcy estate is $291,360.10 (based on a redemption of price of $10.23213687 per share). . . .
>
> To encourage a speedy and efficient resolution of this matter prior to the commencement of litigation against you, the Trustee will accept $262,224.09 in full satisfaction of the amounts claimed, if paid within fifteen (15) days of the date of this letter. This represents a 10% discount of the amount for which the Trustee may sue if this matter is not resolved.
>
> Accordingly, the Trustee demands payment of $262,224.09 in immediately available U.S. funds, payable to the "Berger Singerman LLP Trust Account," and directed to my attention, within 15 days of the date of this letter. In the absence of a timely, conforming payment, our firm, on behalf of the Trustee, will take appropriate action, including the filing of an adversary complaint commencing a lawsuit against you seeking recovery of all sums due, plus prejudgment interest since the date of the transfer, along with all attorneys' fees and costs.

50. The Demand likewise attached a draft Adversary Complaint (filed herewith as **Exhibit "C"**) which set forth, among other things, claims for "avoidance of fraudulent transfer" pursuant to 11 U.S.C. § 548(a)(1)(A) and 11 U.S.C. § 548(a)(1)(B).

51. Plaintiff has been informed that *dozens of identically situated (and innocent) stockholders* have received materially identical letters and draft complaints seeking the return of

10

the entire amounts received in connection with the redemption of the Public Shares (*i.e.*, in order to recover funds sufficient to cover approximately *$1.5 million* in purported claims, Berger Singerman is attempting to claw back *$117 million in protected amounts held in trust* and properly returned to stockholders).

52. Were it to be successful in doing so, it would purportedly be entitled to between *$35 million and $47 million* in contingency fees alone, meaning Berger Singerman's fees would be between *23 and 32 times* the amount of creditor claims they purportedly were retained to recover, and the SPAC's public shareholders would be left with tens of millions of dollars in losses from their purchases of Public Shares despite a guarantee that their investment would be returned to them (with interest) if the SPAC failed to complete a business combination.

53. Such an outcome would effect a massive and senseless transfer of money from the SPAC's innocent public stockholders to the law firm of Berger Singerman, all purportedly in an effort to pay creditors that stockholders had nothing to do with and that took no action knowing that the Trust Fund would be rightfully distributed to the public stockholders.

54. The Trustee's demand, if carried out, is unprecedented and, if permitted, would undermine the fundamental soundness of the SPAC model, which (as the creditors have known at all times, including at the time of engagement by the Sponsor) relies on the sanctity of a SPAC's trust account to ensure that such amounts are not to be used for any corporate purpose or debt unless and until a business combination is completed.

## COUNT I

### Declaratory Judgment That The Trust Funds Were Never Property Of The Estate And Are Otherwise Protected By Law And Equity From Preference Claims

55. Plaintiff repeats and realleges the allegations set forth in the paragraphs above as if fully set forth herein.

56. Property of a bankruptcy estate is defined by 11 U.S.C. §541(a). The extent of a bankruptcy estate's interest in property is the same as the extent of the debtor's interest in property existing at the time of the bankruptcy filing. If, at the time of the bankruptcy filing, the debtor has a limited interest in an asset, it is that limited interest in the asset that is the property of the bankruptcy estate. Where the estate holds only bare legal title, but no equitable interest in property of the estate, §541(d) limits the estate's interest in the property to such bare legal title, but not any further equitable title.

57. Defendant asserts both a legal and equitable interest in the Trust Funds returned to Plaintiff and others. However, as of the date of the filing of the petition, the bankruptcy estate's— and therefore the Defendant's interest in any transfers made prior to the filing of the petition— consisted, at best, of bare legal title with respect to the Trust Funds and no corresponding equity interest. Therefore, Defendant incorrectly asserts that such transfers, including the transfer to Plaintiff, are recoverable under one or more subsections of Chapter 5 of Title 11, U.S.C.

58. Pursuant to §541 and 28 U.S.C. § 2201, Plaintiff seeks a declaration from this Court that the Trust Funds were not part of Debtor's estate, and are therefore not subject to recovery by the Defendant under any chapter of the Bankruptcy Code

59. In the alternative, even if the Court declines to find that the Trust Funds were not part of the Debtor's estate, then Plaintiff is entitled to declaratory judgment holding that the

12

Debtor's transfer of the Trust Funds to Plaintiff and other public stockholders is protected by law and equity from the Trustee's avoidance claims, including by 11 U.S.C.A. § 546(e) and 11 U.S.C.A. § 550(b)(1).

60. Because of the Defendant's demand for the return of the Trust Funds and the imminent legal action against numerous stockholders, there is an actual and substantial controversy between the Defendant and Plaintiff, which have adverse legal interests with respect to the Trust Funds and the redemption of Debtor's Public Shares.

61. Accordingly, Plaintiff is entitled to a declaratory judgment that the transfer of Trust Funds is not avoidable under any chapter of the Bankruptcy Code.

62. Such a declaration will prevent the incursion of excessive attorney's fees in the pursuit of recoveries that were never property of the estate and will provide much needed guidance as to potential further litigation against other stockholders regarding substantially identical legal issues.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment as follows:

A. Declaring that the Trust Funds are not now, and never were, property of the estate;

B. Declaring that the Trust Funds are protected by law and equity from preference claims;

C. Declaring that the Trustee has no legal claim(s) or other entitlement to the Trust Funds;

D. Granting any additional extraordinary, equitable and injunctive relief to the fullest extent permitted by law and/or equity and consistent with the allegations above;

E. Awarding Plaintiff the costs of the action, including reasonable attorneys' fees, accountants' fees, consultants' fees, and experts' fees, costs, and expenses; and

F.      Granting such further relief as the Court deems just and equitable.


Dated: February 14, 2024                    */s/ Robert P. Charbonneau*
                                            **AGENTIS LAW**
                                            Robert P. Charbonneau
                                            45 Almeria Ave.
                                            Miami, Florida 33134
                                            rpc@agentislaw.com
                                            (305) 722-2002

                                            **MORRIS KANDINOV LLP**
                                            Aaron T. Morris (*pro hac forthcoming*)
                                            Andrew W. Robertson (*pro hac forthcoming*)
                                            Jonathan Voegele (*pro hac forthcoming*)
                                            305 Broadway, 7th Floor
                                            New York, New York 10007
                                            aaron@moka.law
                                            andrew@moka.law
                                            jonathan@moka.law
                                            (212) 431-7473

                                            *Attorneys for Plaintiff*